IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 20, 2016

## STATE OF TENNESSEE v. KENNETH KYLE FLETCHER

**Appeal from the Criminal Court for Carter County**
**No. 20982A     Robert E. Cupp, Judge**

---

**No. E2015-02256-CCA-R3-CD – Filed October 26, 2016**

---

The defendant, Kenneth Kyle Fletcher, was convicted by a Carter County jury of facilitation of initiation of a process to manufacture methamphetamine, a Class C felony. Following a sentencing hearing, the trial court sentenced him to ten years on community corrections. In a separate case, the trial court sentenced the defendant to concurrent four-year sentences for five counts of promoting the manufacture of methamphetamine and ordered that the four-year sentence be served consecutively to the ten-year sentence in the instant case, for a total effective sentence of fourteen years on community corrections. In a timely appeal to this court, the defendant challenges the sufficiency of the convicting evidence and the trial court's order of consecutive sentencing. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

David L. Robbins, Johnson City, Tennessee, for the appellant, Kenneth Kyle Fletcher.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Anthony Wade Clark, District Attorney General; and Dennis D. Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On February 20, 2011, the defendant's employer, John Cote, who allowed the defendant and his girlfriend to live in a camper on his rural Carter County property,

called 911 to report that he had discovered a methamphetamine laboratory in the camper. Mr. Cote gave investigators permission to search the property, and they discovered evidence that led the Carter County Grand Jury to return a presentment charging the defendant and his girlfriend, Nancy Diane Harmon, with initiation of a process to manufacture methamphetamine, a Class B felony; promotion of the manufacture of methamphetamine, a Class D felony; and felony possession of drug paraphernalia, a Class E felony. The defendant's case was subsequently severed from Ms. Harmon's, and the promotion and possession counts of the presentment were dismissed, leaving the defendant to proceed to trial on the single count of initiation of a process to manufacture methamphetamine.

The State's first witness at the defendant's June 18, 2013 trial was Sergeant Harmon Duncan of the Carter County Sheriff's Department, a criminal investigator assigned to the drug task force and an expert in methamphetamine production, who described in great detail the methamphetamine manufacturing process and explained that pseudoephedrine was "the only required element" for the process. Sergeant Duncan testified that in October 2010 he received information about possible methamphetamine production activity on Mr. Cote's property. Once in October and again in November, he and Lieutenant Little went to the area to conduct surveillance. However, because the property was in a "pretty close community" with mostly dead-end roads, they were unable to find a place to park for any length of time.

Sergeant Duncan testified that all sales of pseudoephedrine in Tennessee and surrounding states are recorded and listed on a database called "NPLEx." He said that individuals are restricted by law from purchasing more than 3.6 grams in a twenty-four-hour period or more than 9 grams in a thirty-day period. He identified printouts from the database that showed all of the defendant's and Ms. Harmon's pseudoephedrine purchases made in the months preceding the 911 call in the instant case, which were published to the jury and admitted as trial exhibits.

According to the database, the defendant made a total of eleven purchases of products containing pseudoephedrine from May 1, 2010 through January 29, 2011: 3.6 grams from a Boone, North Carolina CVS pharmacy on January 29, 2011; 2.88 grams from a Boone, North Carolina CVS pharmacy on December 16, 2010; 3.6 grams from a Boone, North Carolina CVS pharmacy on December 3, 2010; 3.6 grams from a Newland, North Carolina CVS pharmacy on November 4, 2010; 3.6 grams from an Elizabethton, Tennessee CVS pharmacy on October 2, 2010; 2.4 grams from a Boone, North Carolina CVS pharmacy on September 24, 2010; 3.6 grams form an Elizabethton, Tennessee CVS pharmacy on September 1, 2010; 3.6 grams from an Elizabethton, Tennessee CVS pharmacy on August 9, 2010; 3.6 grams from an Elizabethton, Tennessee CVS pharmacy

on July 27, 2010; 2.88 grams from an Elizabethton, Tennessee CVS pharmacy on July 1, 2010; and 2.88 grams from an Elizabethton, Tennessee CVS pharmacy on May 1, 2010.

According to the database, Ms. Harmon made a total of nineteen purchases of products containing pseudoephedrine from January 2, 2010 through September 3, 2012, at various pharmacies located in East Tennessee and Western North Carolina. The database also showed that she was blocked from one attempted pseudoephedrine purchase on June 20, 2012, because she had already exceeded the 9 grams in thirty days allowed by law.

Sergeant Duncan testified that he responded to Mr. Cote's 911 call, received his permission to search the property, and found a number of items in and around the camper that are used in the methamphetamine manufacturing process. He identified photographs of these items, which were published to the jury and admitted as exhibits. Sergeant Duncan testified that a cooler located underneath the camper contained bottles, tubing, and a funnel, consistent with the "one pot" methamphetamine manufacturing process. Other items used in the methamphetamine manufacturing process, which were found in or around the camper, including in bags of trash in the back of Mr. Cote's pickup truck, included: coffee filters; lye; glass jars; aluminum foil; a Pyrex dish with white residue inside; several funnels; rubber gloves; cellophane bags with the corners cut off, which Sergeant Duncan testified were commonly used for packaging of the completed product; camp fuel; a strainer; and Walgreens "instant cold packs," which, according to Sergeant Duncan, contain ammonium nitrate, "a catalyst chemical that's used in the first stage of meth manufacture." He said that the ammonium nitrate contained in the cold packs was a purer product than the ammonium nitrate sold in fifty-pound bags of lawn fertilizer and, thus, preferred by methamphetamine manufacturers.

Sergeant Duncan testified that one of the Walgreens cold packs was opened, which indicated to him that a common household chemical had been altered to initiate the process of manufacturing methamphetamine:

What that tells me as a . . . law enforcement officer when I find a meth lab components and I find a bag of this that's been opened that [that is] initiation of process. That tells me that a chemical, that a common household chemical, or a commercial product that's sold to you and I on the street, or our families, has been altered to a point to where it . . . would be inconsistent to believe it was used for anything else except to get the ammonium nitrate out of there.

Based on his training and experience, he estimated that the products had been put together approximately three to five days before the officers discovered them. There was

-3-

"no doubt in [his] mind" that what he found that day was "an active [methamphetamine] cook." Sergeant Duncan testified that two liquid samples that they found in bottles at the site, which they sent to the Tennessee Bureau of Investigation laboratory for testing, contained 6.9 grams of methamphetamine and 3.1 grams of methamphetamine, respectively. In addition to the various methamphetamine components, he also found the defendant's birth certificate, Ms. Harmon's birth certificate, and a birthday card from Ms. Harmon to the defendant. Sergeant Duncan testified that Ms. Harmon had been charged with initiation of a process to manufacture methamphetamine in connection with the case and had pled guilty.

On cross-examination, Sergeant Duncan testified that the fact that an individual was not buying pseudoephedrine did not mean that the individual was "not [manufacturing] it because the Smurf community will take care of cooks." He explained that "Smurf" was a term adopted by the law enforcement community to refer to those "people that go out and get pseudoephedrine because one cook can't get it all." He stated that he investigated Mr. Miller and another man who had been living with Mr. Cote but did not find anything to indicate that either of them was involved in the manufacture of methamphetamine. He also investigated Mr. Cote, and Mr. Cote was charged in connection with the case. He testified that his "best guess" was that the methamphetamine manufacturing process he discovered on Mr. Cote's property had begun three to five days before he observed it. That, however, was just his "best guess"; the process could have been started as early as one to two weeks before he found the items. Finally, he acknowledged that no methamphetamine was found in the camper and that no fingerprints were recovered from any of the evidence.

Forty-seven-year-old John Cote testified that he was a self-employed contractor and had hired the defendant, a carpenter, along with ten other individuals, to help him on a major renovation project he began in 2010. The defendant and his girlfriend were living in a tent when he first hired the defendant, and he helped them by allowing the defendant to place in the backyard of his 100-acre property in Poga a bumper-pull camper that the defendant subsequently bought. He also allowed the defendant to run an extension cord from his house to the camper. Mr. Cote testified that the defendant and Ms. Harmon lived together in the camper. He said the defendant was a good worker initially and that he and the defendant often rode together to their job site.

Mr. Cote testified that a few weeks before he made the 911 call, he was outside in the area between the barn and the camper when he noticed a peculiar burning smell that reminded him of the smell of radiator fluid in an overheated vehicle. He reported it to an officer at the Carter County Sheriff's Department, who told him that he did not have enough proof to warrant an investigation and that Mr. Cote should call them if he gathered any additional information. Mr. Cote testified that he called 911 on February

20, 2011, to report that there was "a meth lab on [his] property" after having learned that morning from individuals at the community store that the defendant and Ms. Harmon had been arrested the previous day on methamphetamine-related charges.

Mr. Cote explained that the people at the store had described to him what a "meth lab" looked like and that he searched underneath the defendant's camper and found a cooler that contained plastic containers with "rocks, or tablets on the bottom." He said he called 911 to report the meth lab after finding those items that were consistent with the description he had been given. Before the officers arrived, he returned to the camper, "bagged up some stuff" that he found in and around the camper, and placed the bags in the back of his pickup truck. He stated that he bagged the items because he wanted to get the camper off his property.

Mr. Cote testified that when the officers arrived, he gave them consent to search anywhere on the property. He also truthfully answered every question they asked, including whether he had ever purchased pseudoephedrine for the defendant. Mr. Cote said that the defendant and Ms. Harmon asked him to buy allergy pills for Ms. Harmon on one of his trips to town, telling him that Ms. Harmon had allergies. He found nothing suspicious about their request at the time he made the purchases for them.

On cross-examination, Mr. Cote testified that Tommy Dugger introduced him not only to the defendant, but also to almost all of the eleven people that he had working for him at the time. At the time Mr. Cote called 911, Dan Rippy and possibly a man named "Travis," were living with him in his house. He said he bought Sudafed for the defendant twice, but it was before he smelled the peculiar burning odor or had any suspicions that the defendant was making methamphetamine. Mr. Cote stated that he had never used methamphetamine and did not know much about it until the events in the case at bar transpired. He acknowledged that he had been charged in the case but said that his charges were being dismissed. In his opinion, he was charged because the laboratory was located on the property that he leased.

On redirect examination, Mr. Cote reiterated that he had never used methamphetamine. He testified that he had tried marijuana approximately eighteen years earlier but had never tried anything "worse than that" and had never been convicted of any kind of drug offense.

Sergeant Jeff Hayes of the Boone, North Carolina, Police Department testified that on February 3, 2011, he responded to a shoplifting complaint at the Boone Walmart, where the store's loss prevention department had detained a man, later identified as the defendant, who had stolen a coffee bean grinder. The defendant identified himself to Sergeant Hayes as "Allen Scott Miller," produced a valid Tennessee driver's license in

that name, and "rattled . . . off" Mr. Miller's correct biographical information when Sergeant Hayes questioned him. Sergeant Hayes testified that he initially wrote out a summons in the name the defendant provided. However, after learning on February 7 that the defendant had provided a false name, he dismissed the original citation in Mr. Miller's name and took out warrants in the defendant's name for larceny, fraud, and resisting, delaying, or obstructing an officer in the performance of his duties.

Sergeant Hayes testified that on February 18, 2011, he spotted the defendant's distinctive pickup truck in Boone, identified the defendant as the passenger, and initiated a traffic stop of the vehicle. When he opened the passenger door of the vehicle and said, "Kenneth, I have a warrant for your arrest," the defendant replied, "I figured you did, buddy." Ms. Harmon was driving the vehicle and on the passenger side floorboard was a purse that contained a white plastic bag with three coffee filters. In the middle of the top coffee filter was a "white powdery substance." On the defendant's person, he found a Tennessee Primary Care insurance card in the name of Allen Scott Miller, a North Carolina driver's license in the name of Allen Scott Miller, and a hypodermic needle.

Sergeant Hayes testified that during the booking process at the sheriff's department, the defendant complained that he felt nauseous and asked to use the restroom. Suspicious, Sergeant Hayes slid a trash can to the defendant and told him to vomit in it. The defendant "dry heaved, gagged several times" and then said he was no longer feeling sick. As the defendant was later changing out of his street clothes into an orange jumpsuit, a black bag fell out of the crotch area of his long johns. Sergeant Hayes testified that he looked at the other officer in the room and asked, "I wonder what that could be?" before turning to look at the defendant without saying a word to him. The defendant looked back at him and said, "I guess it's dope." Sergeant Hayes testified that three smaller bags were inside the black bag and that the defendant told him the two smaller bags contained "meth" and that the medium-sized bag contained "MSM," an over-the-counter substance sold at Walmart to treat joint pain.

Sergeant Harmon Duncan, recalled as a witness for the State, testified that pseudoephedrine pills must be ground up to be used in the methamphetamine manufacturing process. He said that manufacturers usually use a pill grinder or a blender to grind up small amounts of pills. He had never seen anyone use a coffee bean grinder for that purpose but thought it possible that someone might.

The forty-six-year-old defendant testified that he had been using methamphetamine since the age of eighteen and was an addict who had been in five different methadone clinics since 2003 in an effort to break his addiction. He became acquainted with Mr. Cote when Mr. Dugger pointed him out as someone who had "the best stuff in . . . the community." He began working as a carpenter for Mr. Cote, who

-6-

paid him $12 an hour and bought the camper in which the defendant and Ms. Harmon lived. According to the defendant, he spent almost everything he earned purchasing methamphetamine from Mr. Cote to feed his addiction. In addition to paying Mr. Cote cash for the drugs, the defendant and Ms. Harmon also bought cold medicine containing pseudoephedrine, which they traded to Mr. Cote for methamphetamine at the rate of one gram of methamphetamine for each box of cold medicine. The defendant testified that he and Mr. Cote used methamphetamine together on "[s]everal occasions," with Mr. Cote "snort[ing]" or "smok[ing]" it, while the defendant injected his. He said that other individuals who worked for Mr. Cote also purchased methamphetamine from Mr. Cote.

The defendant acknowledged he had prior convictions for aggravated burglary, "another burglary charge," "attempt to manufacture," and "conspiracy to sell Schedule II." He said all his convictions were based on guilty pleas; he had never attempted to take any matter to trial but instead admitted his guilt in each case. He also claimed that he had been on his way to a methadone clinic appointment at the time Sergeant Hayes pulled him over and arrested him.

On cross-examination, the defendant testified that Mr. Cote was the individual who was "cooking the meth" but conceded he had never seen him doing it. The defendant claimed to have no knowledge of how to make methamphetamine himself but acknowledged he had pled guilty to attempting to manufacture methamphetamine. He also acknowledged he had two prior convictions for aggravated burglary, one prior conviction for theft over $500, two prior convictions for theft of $500 or less, one prior worthless check conviction, and one prior conviction for criminal simulation. Finally, he acknowledged he had used Mr. Miller's identification to hide his identity when he was arrested for shoplifting at Walmart but denied having ever used it to purchase pseudoephedrine.

Following deliberations, the jury found the defendant not guilty of initiation of a process to manufacture methamphetamine but convicted him of the lesser-included offense of facilitation of initiation of a process to manufacture methamphetamine, a Class C felony. At a July 15-16, 2013 combination guilty plea/sentencing hearing, the defendant pled guilty as a Range II, multiple offender to five counts of promoting the manufacture of methamphetamine, with offense dates of May 1, 2010, May 4, 2010, July 1, 2010, July 4, 2010, and July 27, 2010, with five additional counts dismissed and sentencing left to the discretion of the trial court. Defense counsel proposed no mitigating factors, and the trial court did not find any applicable. The trial court applied as an enhancement factor the fact that the defendant had a previous history of criminal convictions and criminal behavior in addition to those necessary to establish his range, noting that the defendant had an "extensive" and "unbelievable" criminal history that included four prior felony convictions, making a total of ten felony convictions when

added to the six felony convictions for which he was currently being sentenced. The trial court also applied as an enhancement factor the defendant's repeated failures to comply with the conditions of a sentence involving release into the community, noting the following history of the defendant's attempts at probation and other alternative sentencing:

> For the record, I want to put in this record that conduct. It's talking about history of supervision on a . . . felony. Probation to alternative community corrections revoked, reinstated, that was . . . seven months later. Five months later he was revoked again. On 7/11/01 he was sent to boot camp. On 10/25/01, three months later, he was released. He didn't go to boot camp, apparently, released on probation. On 5/24/04 he made it for a little while then he absconded. They got him back on 11/10/04. On 9/23/05 he was revoked. Then he was released to alternative community corrections again on 8/2/07. 3/28/08, which was . . . seven months later, he absconded. On 5/21/08, two months later, they returned him from absconding status. On 7/1/08 he was reinstated. On 2/18/11, he made it for a while, he absconded again, then got . . .incarcerated in North Carolina. He was then released from North Carolina custody, returned from absconder's status. He was then revoked and the sentence expired then two months later. It's unbelievable. It's truly unbelievable.

The trial court sentenced the defendant to concurrent terms of four years for each of the promoting methamphetamine convictions in case number 20980 and ten years for the facilitation conviction in case number 20982A, which is the case at bar. The court ordered the concurrent four-year sentences to be served consecutively to the ten-year sentence, for an effective sentence of fourteen years as a Range II offender.[1]

The trial court addressed the manner of service of sentence at a subsequent August 9, 2013 hearing. The court first noted, again, the defendant's repeated failures to comply with the conditions of his sentences involving release into the community, including his repeated instances of absconding from supervision. The trial court also noted, however, an "impressive" letter that it had received from the defendant in which the defendant apparently expressed sincere remorse."[2] Based primarily on the strength of that letter, the trial court granted the defendant's request for alternative sentencing by ordering that he serve his sentence on community corrections in the "Lighthouse" rehabilitation program.

---

[1] The judgment forms for case number 20980 are not in the record. The judgment form for case number 20982A does not reflect the imposition of consecutive sentencing.

[2] Although the letter was made an exhibit to the hearing, it is not included in the record before this court.

A hearing on the defendant's September 10, 2013, motion for new trial was held by a different judge on November 23, 2015, apparently because the defendant left the community corrections program without leave and "[a]bsented himself from the court" for some period, during which time the original trial judge retired. At the conclusion of the hearing, the trial court denied the motion for new trial. Thereafter, the defendant filed a timely notice of appeal to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first contends that the evidence is insufficient to sustain his conviction, citing State v. Christopher Hammack, No. M2015-00898-CCA-R3-CD, 2016 WL 1270313 (Tenn. Crim. App. Mar. 31, 2016), to argue that mere evidence that he was near the meth lab, used methamphetamine, and had knowledge that another individual was "cooking meth" on the property, was insufficient for the jury to find him guilty of facilitating the felony. The State responds by arguing that any rational trier of fact could find that the defendant knowingly furnished substantial assistance in the initiation of a methamphetamine manufacturing process based on the defendant's admissions that he lived in the camper where the active methamphetamine lab was found and that he purchased pseudoephedrine pills to enable the production of methamphetamine and to feed his addiction. We agree with the State.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Tennessee Code Annotated section 39-17-435 provides in pertinent part that "[i]t is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine." Tenn. Code Ann. § 39-17-435(a) (2014). "'[I]nitiates' means to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation." Id. § 39-17-435(c). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Id. § 39-11-403(a). Thus, to sustain the conviction, the State had to prove beyond a reasonable doubt that the defendant, knowing that another meant to initiate a process intended to result in the manufacture of methamphetamine, knowingly furnished substantial assistance to that person in the commission of that felony.

We agree with the State that the evidence, when viewed in the light most favorable to the State, was more than sufficient to sustain the defendant's conviction. The State presented detailed expert testimony to show that an active methamphetamine laboratory was discovered underneath the defendant's camper, where the defendant lived with his girlfriend, and that various components of the manufacturing process were found in and around the camper. The State also presented evidence of the defendant's and Ms. Harmon's numerous purchases from different pharmacies of pseudoephedrine in the months preceding the discovery of the laboratory and of the defendant's possession of methamphetamine at the time of his North Carolina arrest. Finally, the defendant himself

admitted in his testimony that he purchased pseudoephedrine for Mr. Cote to use to manufacture methamphetamine, which Mr. Cote traded to him in exchange for the pseudoephedrine pills he provided for him.

We agree with the State that the facts in this case are readily distinguishable from those in Hammack, in which this court reversed the defendant's conviction for facilitation of initiation of a process to manufacture methamphetamine. The defendant in that case was discovered alone in the home of an associate, on property in which a methamphetamine laboratory that was estimated to be two days old was found in a backyard shed. Hammack, 2016 WL 1270313, at *1-2. Although Mr. Hammack admitted that he was aware of the methamphetamine laboratory and had used methamphetamine earlier that day, there was no evidence that he had ever been in the shed or was present when the laboratory was active. Id. at *5.

In the case at bar, by contrast, the defendant lived in the very camper under which an active methamphetamine laboratory was found, purchased an excessive number of cold tablets containing the essential ingredient for the manufacture of methamphetamine, and claimed in his own testimony that he bought the tablets for Mr. Cote to use to "cook" the methamphetamine that he craved. We, therefore, affirm the defendant's conviction for facilitation of initiation of a process to manufacture methamphetamine.

## II. Consecutive Sentencing

The defendant also contends that the trial court erred in ordering consecutive sentencing, arguing that the case should be remanded for a new sentencing hearing because the trial court failed to make findings of fact or conduct the proper analysis in support of the imposition of consecutive sentencing. We respectfully disagree.

We review the trial court's consecutive sentencing determinations for an abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. See State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013) (applying same deferential standard announced in State v. Bise, 380 S.W.3d 682 (Tenn. 2012), to trial court's consecutive sentencing decisions).

We find no abuse of discretion in the trial court's sentencing determinations. The trial court may, in its discretion, order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) apply, including that the defendant is an offender whose record of criminal activity is extensive, which was a finding that the trial court made in this case. Id. § 40-35-115(b)(2). Accordingly, we affirm the sentences imposed by the trial court.

-11-

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE